**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 06-00001 (ESH)** |
| | ) | |
| **JACK A. ABRAMOFF,** | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In February 2014, the United States government seized two federal income tax refunds from defendant Jack Abramoff based on his outstanding restitution obligations in the above-captioned case.  Defendant moved for the return of these funds in order to pay outstanding state income taxes and professional fees.  (Def.'s Mot. for Return of Seized Tax Refund in Order to Pay Outstanding State Taxes and Accounting and Legal Fees, May 27, 2014 [ECF No. 70] ("Def.'s Mot."), at 1.)  Instead of responding to defendant's motion, the government moved for an order to show cause why defense counsel should not be disqualified.  (Mot. for Order to Show Cause Why Defense Counsel Should Not Be Disqualified and to Stay Briefing Schedule Pending Resolution, June 13, 2014 [ECF No. 72] ("Gov't.'s Mot.").)  For the reasons explained below, the Court will deny the government's motion and order it to respond to defendant's motion for return of his seized tax refunds within ten days.

**BACKGROUND**

On January 3, 2006, Jack Abramoff pleaded guilty to a three-count criminal information. (Plea Agreement, Jan. 3, 2006 [ECF No. 4].)  For these crimes, the Court sentenced Mr.

Abramoff to forty-eight months in prison and three years of supervised release. (Judgment, Sept. 9, 2008 [ECF No. 48].)  It also entered an order of restitution in the amount of $23,134,695.[1] (*See* Restitution Order, Sept. 4, 2008 [ECF No. 43], at 1-2.)  The restitution order required Mr. Abramoff to pay a percentage of his gross earnings each month "until further order of the Court or until paid in full."[2] (*Id.* at 2.)

On May 20, 2009, Mr. Abramoff's then-counsel notified the government that Mr. Abramoff, who was still incarcerated, had received a federal income tax refund of $520,189. (Def.'s Mot. at 5.)  Mr. Abramoff's wife already had used part of this refund to pay outstanding taxes owed to the State of Maryland, as well as for professional services, other personal debts, and tuition for their children's private school. (*Id.*)  After learning this, the government moved to freeze further expenditures by Mrs. Abramoff and sought a formal accounting of all of the expenditures she had made. (*Id.* (citing Mot. for Immediate Modification of Restitution Order, May 21, 2009 [ECF No. 51]).)

On August 11, 2009, the Court held a hearing on that motion.  The Court concluded, without objection from the government, that Mr. Abramoff should not be penalized for the expenditures already made by his wife, explaining that "nobody is pocketing money here and doing something they're not supposed to." (Def.'s Mot. Ex. 8, Aug. 11, 2009 Hearing Transcript ("Hrg. Tr."), at 13, 20.)  At the hearing, the government also represented to the Court that if Mr. Abramoff was issued a tax refund in the future it would take steps to hold this money, "pending the Court's authorization about the distribution of funds."  (Hrg. Tr. at 26-27.)  After the hearing,

---

[1] In addition to the restitution in this case, Mr. Abramoff was ordered to pay $21,701,015.45 in restitution in a case in the Southern District of Florida.  (*See* Def.'s Mot. at 3 n.1.)

[2] The restitution order included a sliding-scale for purposes of calculating the percentage of Mr. Abramoff's income to be paid toward restitution: for gross earnings up to $50,000 he must pay ten percent; for gross earnings up to $100,000 he must pay twenty percent; and for gross earnings over $100,000 he must pay thirty percent. (*Id.* at 2.)

the parties submitted a plan for the disbursement of the remaining tax refund.  Based on the representations of the parties, the Court ordered that $35,000 of the refund could be used to repair the roof of the Abramoff's home; $33,000 of the refund would be paid in restitution, split evenly between the D.C. and Florida creditors; and the remaining amount of the refund could be used "by the Abramoff family to cover ordinary living expenses and professional services." (*See* Order, Oct. 14, 2009 [ECF No. 59].)

On February 7 and 14, 2014, Mr. Abramoff once again received notice of significant federal tax refunds.  This time, however, the United States Attorney's Office instructed the Department of Treasury to seize the entirety of these refunds in light of defendant's outstanding restitution obligations.  Mr. Abramoff, now represented by Peter Zeidenberg, a partner at the Washington, D.C. office of Arendt Fox LLP, filed a motion to recover these funds. (Def.'s Mot. at 1-2.)  In this motion, Mr. Abramoff emphasized that he is "not requesting he be permitted to keep any portion of [the] refunds for his own or his family's personal use." (*Id.* at 5.)  Instead, he seeks return of these funds only to pay past due income taxes owed to the State of Maryland and fees owed to his accountants who "are solely responsible for obtaining the refund that the government has now seized and forfeited" but who "have received no payment."[3] (*Id.* at 4-5.)

Instead of responding to Mr. Abramoff's motion on the merits, the government filed a motion for an order to show cause why Mr. Zeidenberg should not be disqualified from the case and to stay briefing on defendant's motion. (*See* Gov't.'s Mot. at 1.)  In its motion, the government argues that Mr. Zeidenberg's previous employment in the Public Integrity Section at

---

[3] Among other reasons, defendant represents that he is particularly concerned about his outstanding state tax obligations because the Comptroller of Maryland has notified the Motor Vehicle Administration and he and his wife therefore may be unable to renew their drivers' licenses or vehicle registrations, which would severely inhibit their ability to work. (*See* Def.'s Mot. at 2 n.2.)

the Department of Justice at the time Mr. Abramoff was indicted and, more importantly, his role

as trial counsel in the case against David Safavian, the General Services Administration Chief of

Staff convicted of obstruction of justice and making false statements in connection with a golf

trip funded by Mr. Abramoff, disqualify him from representing Mr. Abramoff. (*Id.* at 7-8.)

Defendant filed an opposition arguing that the government's motion is "not only frivolous, it is

brought simply to seek tactical advantage . . . ." (Def.'s Opp. to Gov.'s Mot., June 17, 2014 [ECF

No. 74] ("Opp."), at 1.)  The government filed a reply.  (Reply Mem. in Further Support of

Gov't's Mot. for Order to Show Cause Why Defense Counsel Should Not be Disqualified and to

Stay Briefing Schedule Pending Resolution, June 30, 2014 [ECF No. 76] ("Reply").)

## ANALYSIS

### I.  LEGAL STANDARD

"The District of Columbia Rules of Professional Conduct have been adopted by this

Court and are applicable to all lawyers who handle litigation in this District." *United States v.*

*Philip Morris*, 312 F. Supp. 2d 27, 38-39 (D.D.C. 2004) (citing Local Rule 83.15(a)).  This case

specifically concerns what is often referred to as a "revolving door" scenario where "a

government attorney . . . leaves to join a private firm and begins to represent clients against, or

before any agency of, the former government employer." *See Brown v. D.C. Board of Zoning*

*Adjustment*, 486 A.2d 37, 43 (D.C. 1984) (*en banc*).  D.C. Rule of Professional Conduct 1.11(a)

governs "revolving door" conflicts of interest.  It states,

> [a] lawyer shall not accept other employment in connection with a matter which is the
> same as, or substantially related to, a matter in which the counsel participated personally
> and substantially as a public official or employee. Such participation includes acting on
> the merits of a matter in a judicial or other adjudicatory capacity.

The D.C. Court of Appeals' decision in *Brown* has been recognized as the "major

authority in this jurisdiction for [the] interpretation of D.C. Rule 1.11." *Philip Morris*, 312 F.

Supp. 2d at 38.  In that decision, the Court of Appeals announced a two-step process for determining whether counsel should be disqualified in a revolving door situation.[4]  First, the party seeking disqualification must show that the "factual contexts of the two (or more) transactions overlap in such a way that a reasonable person could infer that the former government attorney may have had access to information legally relevant to, or otherwise useful in, the subsequent representation . . . ."  *Brown*, 486 A.2d at 49-50.  If the moving party is able to make such a showing, it will "have established a prima facie showing that the transactions are substantially related."  *Id.*  Then, the burden shifts to the non-moving party to "rebut [this] showing by demonstrating that he or she could not have gained access to information during the first representation that might be useful in the later representation."  *Id.*  In its decision, the D.C. Court of Appeals emphasized that "the attorney cannot meet this rebuttal burden simply by claiming that no useful information was, in fact, received in the first matter."  *Id.* at 50.  Yet, at the same time, the court also made clear that the revolving door rule "is designed to address at least a reasonable possibility that some specifically identifiable impropriety would occur . . . if specific information (as distinguished from general agency expertise or contacts) that a former government attorney *may* have had access to in one matter is *likely* to be useful in a subsequent matter . . . ."  *Id.* at 48 (internal quotation marks and citations omitted).

## II.     DISQUALIFICATION IS UNWARRANTED

The parties recognize that the first question of whether Mr. Zeidenberg's prior work in the Public Integrity Section at the Department of Justice is "substantially related" to his work on

---

[4] The parties characterize the test in *Brown* differently.  Defendant argues that it is a three-part test.  (Opp. at 4).  The government argues that it is a two-part test. (Reply at 5.)  The parties are, however, talking past one another.  Defendant's "third element" is functionally the same as the government's second: namely, whether there is specific evidence that information from the prior representation *could have been acquired* that is *useful to the present representation*.  *See Brown*, 486 A.2d at 49-50.

behalf of Mr. Abramoff is a difficult one.  (*See* Gov't.'s Mot. at 5 ("We appreciate that this second question [whether the current litigation is substantially related to the prior representation] is not subject to ready resolution."); Opp. at 2 n.1 ("[G]iven how factually interrelated aspects of the Safavian and Abramoff cases were, counsel would not have agreed to enter an appearance in this matter if, for example, Mr. Abramoff was attempting to withdraw his guilty plea . . . [because though] it is not at all clear-cut that such a representation would be improper, it is certainly close to the line.").)  However, the Court is satisfied that even if it were to find that the "factual contexts of the two . . . transactions overlap," defendant's counsel has met his burden to show that he "could not have gained access to information during the first representation that might be useful in th[is] latter representation." *See Brown*, 486 A.2d at 49.  The reality is that the present motion for return of Mr. Abramoff's seized tax refunds has nothing to do with the underlying crimes committed by Mr. Abramoff or his plea agreement.

The government argues that Mr. Zeidenberg's prior employment at DOJ would have given him access to "evidence . . . that would undercut Mr. Abramoff's testimony, including any motive to fabricate . . . ." if he had been called as a witness in the Safavian trial as well as "knowledge about what the government . . . knows about the likelihood of recovering assets from Mr. Abramoff . . . [or] what the Government does not know about the subject . . . . " (Gov't's Mot. at 5-7.)  However, even if Mr. Zeidenberg did have such knowledge, it would have no impact on the issues the Court must now consider: (1) whether the government is legally entitled to seize the entirety of Mr. Abramoff's 2014 tax refund; and (2) whether the government failed to follow the procedure that it represented to the Court at the 2009 hearing that it would follow— a hearing that took place more than a year *after* Mr. Zeidenberg left his job at the Department of Justice.  Ultimately, while the Court is keenly aware of its duty to "be especially careful" when

analyzing "revolving door" cases, *Brown*, 486 A.2d at 49, the Court concludes that Mr. Zeidenberg "could not have gained access to information" while representing the government that "might be useful in [his present] representation [of Mr. Abramoff's tax case]." *See id.*

## CONCLUSION

For the foregoing reasons, the government's motion for an order to show cause is **DENIED**.  The motion to stay the briefing schedule until the resolution of this motion therefore will be **DENIED** at moot.  It is further **ORDERED** that the government shall respond to Defendant's Motion for Return of Seized Tax Refund in Order to Pay Outstanding State Taxes and Accounting and Legal Fees, May 27, 2014 [ECF No. 70] within ten days.  The government shall then have ten days to file a reply, if any.


_____
            /s/
ELLEN SEGAL HUVELLE
United States District Judge

Date:   July 14, 2014